# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TURF NATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N17C-01-271 EMD CCLD |
| | ) | |
| UBU SPORTS, INC., n/k/a/ ARTIFICIAL | ) | |
| TURF SPORTS FIELD, INC., and | ) | |
| JOSEPH MICHAEL VRANKIN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| UBU SPORTS, INC., n/k/a/ ARTIFICIAL | ) | |
| TURF SPORTS FIELD, INC., | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TURF NATION, INC., | ) | |
| | ) | |
| Counterclaim Defendant | ) | |

Submitted: July 28, 2017
Decided: October 11, 2017

*Upon Defendant Joseph Michael Vrankin's Motion to Dismiss for Lack of Personal Jurisdiction*
**GRANTED**

*Upon Counter-Defendant Turf Nation, Inc.'s Motion to Dismiss Count I of Counter-Plaintiff UBU Sports Inc., n/k/a Artificial Turf Sports Field, Inc.'s Counterclaims*
**DENIED**

*Upon Counter-Defendant Turf Nation, Inc.'s Motion for Judgment on the Pleadings on Counts II and III of Counter-Plaintiff UBU Sports Inc., n/k/a Artificial Turf Sports Field, Inc.'s Counterclaims*
**DENIED**

Kenneth J. Enos, Esquire, Kathaleen S. McCormick, Esquire, Mary F. Dugan, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, and William S. Sugden, Esquire, Thomas P. Clinkscales, Esquire, Alston & Bird, LLP, Atlanta, Georgia, *Attorneys for Plaintiff Turf Nation, Inc.*

Stephen E. Jenkins, Esquire, Peter H. Kyle, Esquire, Ashby & Geddes, Wilmington, Delaware and Stephen J. Brown, Esquire, Pedersen & Houpt, P.C., Chicago, Illinois, *Attorneys for Defendant Joseph Michael Vrankin.*

Stephen E. Jenkins, Esquire, Peter H. Kyle, Esquire, Ashby & Geddes, Wilmington, Delaware and Stephen J. Brown, Esquire, Pedersen & Houpt, P.C., Chicago, Illinois, *Attorneys for Defendant UBU Sports, Inc.*

**DAVIS, J.**

## I. INTRODUCTION

This breach of contract action is assigned to the Complex Commercial Litigation Division of the Court. Plaintiff Turf Nation, Inc. ("Turf Nation") brings this action against Defendant UBU Sports, Inc. ("UBU") for breach of contract. Turf Nation also asserts claims against UBU and Defendant Joseph Michael Vrankin for violations of several state Trust Fund Statutes. Turf Nation filed an initial complaint (the "Initial Complaint") on January 12, 2017. UBU answered the Initial Complaint on March 6, 2017, and asserted counterclaims against Turf Nation for: (i) Fraud (Count I); (ii) Breach of Contract (Count II), and (iii) Tortious Interference with Contractual Relations (Count III).

Mr. Vrankin did not answer the Initial Complaint. Instead, on March 10, 2017, Mr. Vrankin moved to dismiss the Initial Complaint for lack of personal jurisdiction (the "Vrankin Motion to Dismiss"). Subsequently, Turf Nation sought leave to amend the Initial Complaint to clarify the grounds for personal jurisdiction over Mr. Vrankin under 10 *Del. C.* § 3114. Turf Nation filed an amended complaint (the "Amended Complaint") on May 10, 2017. UBU filed an amended answer on May 24, 2017 and reasserted the counterclaims against Turf Nation (the "Amended Counterclaim").

2

Turf Nation then moved to dismiss Count I of the Amended Counterclaim ("Turf Nation Motion to Dismiss") pursuant to Superior Court Civil Rule 12(b)(6) ("Civil Rule 12(b)(6)"). Turf Nation also moved for judgment on the pleadings on Counts II and III of the Amended Counterclaim ("Turf Nation Judgment on the Pleadings Motion").

The Court held a hearing on the Vrankin Motion to Dismiss, the Turf Nation Motion to Dismiss, and the Turf Nation Judgment on the Pleadings Motion (collectively, the "Motions") on July 28, 2017. After hearing argument, the Court took the Motions under advisement. This is the Court's decision on the Motions. For the reasons set forth below, the Court will (i) **GRANT** the Vrankin Motion to Dismiss, (ii) **DENY** the Turf Nation Motion to Dismiss, and (iii) **DENY** the Turf Nation Judgment on the Pleadings Motion.

## II. RELEVANT FACTS[1]

Turf Nation is a Delaware corporation with its principal place of business in Dalton, Georgia.[2] Turf Nation manufacturers synthetic sports turf and related products.[3] UBU[4] is a Delaware corporation with its principal place of business in Downers Grove, Illinois.[5] UBU sells and installs turf products manufactured by companies like Turf Nation.[6] Vrankin is a resident of Illinois who served as the President and CFO of UBU from January 2014 to January 2017.[7]

### A. TURF NATION'S ALLEGATIONS AND CLAIMS

Between May 2016 and November 2016, UBU placed orders for turf products with Turf Nation.[8] Turf Nation manufactured and supplied the turf products via requests orders, and billed

---

[1] Unless otherwise indicated, the following are the Relevant Facts as alleged in the amended complaint and the amended counterclaim.
[2] Pl.'s Am. Compl. ¶¶ 1, 8.
[3] Am. Compl. ¶¶ 1, 8.
[4] On or about December 9, 2016, UBU Sports, Inc. changed its name to Artificial Turf Sports Field, Inc. The Court will refer to the entity as "UBU" throughout this Opinion as is consistent with the parties' briefing.
[5] Am. Compl. ¶¶ 1, 9.
[6] *Id.* ¶¶ 1, 9.
[7] *Id.* ¶ 10.
[8] *Id.* ¶ 16.

UBU for the turf products via invoices.[9] The invoices represent orders corresponding to at least twenty installation projects (the "Projects") across the United States.[10]

UBU purportedly defaulted on its obligations under the invoices by failing to timely pay the amounts owed for the turf products.[11] On November 15, 2016, Turf Nation sent a letter to UBU providing notice of UBU's default.[12] To date, UBU has not paid any of the outstanding debt.[13]

The Projects and amounts owed for each Project are: (i) $21,667.06 for turf for the University of Pittsburgh (the "Pittsburgh Project"); (ii) $215,495.59 for turf for Tarleton State University in Texas; (iii) $202,175.77 for turf for Liberty Christian School in Texas; (iv) $216,477.79 for turf for the Texan's NRG Stadium in Texas; (v) $244,540.76 for turf for Indian River High School in New York (the "Indian River Project"); (vi) $144,555.49 for turf for the Buffalo Bills training center in New York (the "Buffalo Bills Project"); (vii) $124,594.94 for turf for Telluride High School in Colorado; (viii) $175,673.06 for turf for Logan High School in Wisconsin; and (xiv) $19,213.08 for turf for Lincoln Middle School in Wisconsin. [14]

Turf Nation alleges that UBU has not paid its subcontractors and suppliers, like Turf Nation, for their work on the Projects.[15] As one example, Turf Nation learned that Adhan Piping Company, the general contractor for the Indian River Project and the Buffalo Bills Project, paid UBU approximately $220,246 for work performed on the Indian River Project.[16] Adhan Piping Company also paid UBU approximately $403,916 for work performed on the Buffalo Bills

---

[9] *Id.*
[10] *Id.*
[11] *Id.* ¶ 17.
[12] *Id.* ¶ 18.
[13] *Id.*
[14] *Id.* ¶¶ 20–22.
[15] *Id.* ¶ 23.
[16] *Id.* ¶ 24.

Project.  UBU, however, has not paid its subcontractors or suppliers for their work on these Projects.[17]

Based on the foregoing, Turf Nation initiated this action against UBU for breach of contract resulting from the unpaid invoices and for violation of Pennsylvania's Contractor and Subcontractor Payment Act for the violations associated with the Pittsburgh Project.  Turf Nation also asserted claims against UBU and Mr. Vrankin for violations of Texas, New York, Colorado, and Wisconsin Trust Fund Statutes.  Finally, Turf Nation asserts a claim against Mr. Vrankin individually for receipt of trust funds in violation of Wisconsin law.

## B.  UBU'S ALLEGATIONS AND COUNTERCLAIMS

UBU's counterclaims arise out of an entirely different set of facts and set forth an alleged fraud scheme executed by Turf Nation's CEO, Sid Nicholls, and UBU's former CEO, Mark Nicholls.  Turf Nation's CEO, Sid Nicholls, is the father of UBU's former CEO and controlling stockholder, Mark Nicholls (collectively, the "Nicholls").[18]  In the Fall of 2014, Mark Nicholls sought to obtain equity investments by third parties into UBU through the sale of membership units in UBU's parent, Turf Industry Holdings, LLC ("Turf Industry").[19]  The investments would be made pursuant to a Membership Interest Purchase Agreement ("MIPA").[20]  Under the MIPA, Mark Nicholls would represent and warrant that UBU had a solid base of existing contracts with its suppliers, such as Turf Nation, purportedly to ease concerns of potential investors.[21]

On October 4, 2014, Mark Nicholls e-mailed Sid Nicholls and stated that he could not find any contract in place between UBU and Turf Nation.[22]  Mark Nicholls then stated that he

---

[17] *Id.*
[18] Def.'s Am. Countercl. ¶ 1.
[19] Am. Countercl. ¶ 13.
[20] *Id.*
[21] *Id.*
[22] *Id.* ¶ 14.

5

would start creating a contract if one could not be found.[23] Mark Nicholls found an old draft contract from 2008, but, upon speaking to Sid Nicholls, Mark Nicholls realized that he could not represent the 2008 draft as a contract already in place because UBU was not incorporated until 2009.[24]

A month later, Mark Nicholls produced a copy of a Manufacture and Supply Agreement (the "Agreement"), dated January 15, 2013, between UBU and Turf Nation to provide to potential investors.[25] The Agreement contained Sid Nicholls' signature, as CEO of Turf Nation, and Mark Nicholls' signature, as President and CEO of UBU.[26] The events precipitating the Agreement and the Agreement itself give rise to UBU's counterclaims.

### i. The Agreement

Through the Agreement, Turf Nation agrees to manufacture and sell to UBU certain turf products, and UBU agrees to purchase these turf products from Turf Nation.[27] The Agreement specifies that UBU must make all purchases of turf products by a written purchase order.[28] Turf Nation will then invoice UBU for the purchased turf products.[29] Turf Nation agrees not to charge UBU more for the products than it "charges to its most valued customer for the same or substantially similar work, services, component materials, or equivalent Products."[30] UBU must then pay the balance on the invoice within sixty days of delivery and acceptance of the products.[31]

---

[23] *Id.*
[24] *Id.*
[25] *Id.* ¶ 15.
[26] *Id.*
[27] *See* Am. Countercl. Ex. A, Manufacture and Supply Agreement (the "Agreement") § 2(a)-(b). Exhibit A to the Amended Counterclaim will be cited to as "Agreement § __".
[28] Agreement § 4(a).
[29] *Id.* § 5(d).
[30] *Id.* § 5(e).
[31] *Id.*

As it relates to payment, however, Section 5(e) of the Agreement contains a section entitled "Credit."[32]  This section states that:

> The maximum amount outstanding from UBU to TN in respect of issued invoices at any one time shall not exceed US $5 Million (the "UBU Credit Limit"). However, on an annual basis or as otherwise reasonably requested by UBU, TN and UBU shall review the amount of the UBU Credit Limit in light of other factors in the Parties reasonable discretion.  TN and UBU will mutually agree if an increase in the UBU Credit Limit is warranted, and if so, the amount of such increase.[33]

In order to ensure payment of invoices, Section 5(g) of the Agreement allows Turf Nation to, upon a minimum of ten days' notice in writing:

> [T]ake any and all actions necessary or appropriate to establish or perfect security interest on Products released to UBU, including, without limitation, filing a lien or liens on fields installed or in the process of being installed with such Products supplied by TN, filing claims against any performance bonds relating to such fields, or filing claims against payments due to UBU in respect of such fields.[34]

Section 13 of the Agreement then contemplates possible events giving rise to an UBU default, including:

> The failure of UBU to pay TN any amount that shall become due and payable under the terms and timing as set out in this Agreement and the continuance of said failure for fifteen (15) days after the giving of written notice of non-payment; or the failure of UBU to perform and observe any other term, condition, covenant, or provision contained in this Agreement and the continuance of such failure for thirty (30) days after the giving of written notice of such failure.[35]

Should UBU fail to cure its default, Section 14 of the Agreement provides Turf Nation certain remedies:

> If a UBU Default within the meaning of Section 13 above has occurred and is continuing, then TN may take any or all of the following actions in addition to any and all rights and remedies available at law or in equity:
>
> (d) Terminate this Agreement upon thirty (30) days written notice to UBU; provided, however, that if UBU pays in full any amounts owing under the Agreement, and

---

[32] *Id.* § 5(e).
[33] *Id.*
[34] *Id.* § 5(g).
[35] *Id.* § 13(a).

7

otherwise cures all UBU Defaults existing under this Agreement, before the effective date of termination, the notice of termination shall be cancelled and the parties shall be restored to their prior position.

(e) Notwithstanding any other provision in this Section 14 or any other Section contained in this Agreement, TN may terminate this Agreement upon thirty (30) days written notice to UBU, for any reason.[36]

All notices, including notice of default, must be mailed to:

UBU SPORTS, INC.
23022-800 Niagara Street
Welland, Ontario, Canada
L3C 7E7
Attention: Mark Nicholls
Telephone: 800-828-8700
Telecopier: 800-828-1300

TURF NATION, INC.
3525 Old Dixie Highway
Dalton, Georgia 30721
Attention: Sid Nicholls
Telephone: (706) 278-4001
Telecopier: (706) 278-4002[37]

### ii. *Turf Nation Terminates the Agreement*

The term of the Agreement was set to expire on December 31, 2023.[38]  However, on November 7, 2014, Sid Nicholls sent Mark Nicholls a letter terminating the Agreement.[39] However, the MIPA, which was dated November 25, 2014, still listed the Agreement as a material contract.[40]  In other words, Turf Nation apparently terminated the Agreement two weeks before Mark Nicholls represented to future investors that the Agreement was in effect.[41]

---

[36] *Id.* § 14.
[37] *Id.* § 23.
[38] *Id.* § 3.
[39] Am. Countercl. ¶ 16.
[40] *Id.*
[41] *Id.*

8

While Mark Nicholls received notice of the termination, Mark Nicholls, together with Turf Nation, purportedly hid the termination from UBU's officers, investors, and agents for over two years.[42] Turf Nation purportedly did not reveal that it terminated the Agreement until November 22, 2016—after UBU had fired Mark Nicholls as CEO.[43] Prior to that time, UBU believed that it was making payments to Turf Nation in satisfaction of its outstanding credit balance under the Agreement, not in satisfaction of particular invoices.[44] In fact, UBU was paying a 30% premium on all turf products it ordered, which UBU believed Turf Nation was applying to UBU's loan balance.[45] Turf Nation continued accepting UBU's payment under the terms of the $5M line of credit in the Agreement, and it never designated the payment to a particular invoice.[46]

Based on the foregoing, UBU counterclaimed against Turf Nation for: (i) Fraud, based on Turf Nation's conduct in executing and terminating the Agreement; (ii) Breach of Contract, based on Turf Nation's improper termination of the Agreement and breach of the Agreement's material terms; and (iii) Tortious Interference with Contractual Relations, based on Turf Nation's conduct in contacting UBU's clients to seek repayment of UBU's purportedly defaulted loans.[47]

---

[42] *Id.* ¶ 19.

[43] *Id.*

[44] *Id.*

[45] Answer ¶ 19; Am. Countercl. ¶ 20.

[46] Am. Countercl. ¶ 20.

[47] On March 17, 2017, UBU also filed a complaint in the Delaware Court of Chancery (the "Court of Chancery Action") against Mark Nicholls for breach of fiduciary duty and against Turf Nation for aiding and abetting breach of fiduciary duty. The complaint states equitable claims against Mark Nicholls and Turf Nation arising from the same facts and circumstances at issue in these proceedings. By order dated July 25, 2017, Chief Justice Strine designated this judicial officer to sit as Vice Chancellor on the Court of Chancery under Del. Const. art. IV, § 13(s) for purposes of adjudicating all issues in the Court of Chancery Action.

9

# III. PARTIES' CONTENTIONS

## A. VRANKIN MOTION

### i. Mr. Vrankin's Contentions

MR. Vrankin first contends that the Court cannot assert personal jurisdiction over him under 10 *Del. C.* § 3104 ("Section 3104") because had had no contact with the State of Delaware other than through his role as CFO of UBU, a Delaware corporation. Mr. Vrankin also contends that his status as CFO of UBU, on its own, does not satisfy the due process requirement for personal jurisdiction under 10 *Del. C.* § 3114 ("Section 3114").

### ii Turf Nation's Contentions

Turf Nation concedes that personal jurisdiction is not appropriate under Section 3104 because Mr. Vrankin did not have sufficient minimum contacts with the State of Delaware. However, Turf Nation argues that personal jurisdiction is appropriate under Section 3114 because Mr. Vrankin is a "necessary and proper party" to this civil action and because Mr. Vrankin controlled the finances of a Delaware corporation.

## B. TURF NATION DISMISSAL MOTION

### i. Turf Nation's Contentions

Turf Nation contends that the allegations of fraud are not pleaded with the requisite particularity. Alternatively, Turf Nation contends UBU lacks standing to bring a fraud claim because the harm alleged was to investors in UBU's parent, not UBU itself.

### ii. UBU's Contentions

UBU contends it pleaded its fraud claim with particularity because the Amended Counterclaim names the time, place, content, and source of the fraud. UBU further contends it

has standing to assert a fraud claim because the Amended Counterclaim pleads several instances of harm caused directly to UBU.

## C. TURF NATION JUDGMENT ON THE PLEADINGS MOTION

### i. Turf Nation's Contentions

Turf Nation argues that the breach of contract and tortious interference with contractual relations claims cannot stand because Turf Nation properly terminated the Agreement in 2014. Alternatively, Turf Nation asserts that even if it did not terminate the Agreement, none of its conduct violated the Agreement for purposes of establishing breach of contract and alike.

### ii. UBU's Contentions.

UBU contends that Turf Nation improperly terminated the Agreement and breached the Agreement by failing to provide the $5M line of credit to UBU and by charging 30% premiums to UBU. Because UBU did not default on its payments based on the terms of the Agreement, UBU contends Turf Nation interfered with its business by contacting UBU's clients.

## IV. STANDARDS OF REVIEW

### A. CIVIL RULE 12(B)(2)

Upon a motion to dismiss under Civil Rule 12(b)(2), the plaintiff is obligated to establish a prima facie case, that personal jurisdiction is sound.[48] "Although the plaintiff must plead specific facts and cannot rely on mere conclusory assertions, the factual record is read in the light most favorable to the plaintiff."[49] "There are two legal questions to be answered in considering a motion under Rule 12(b)(2) . . . whether there is a statutory basis for serving the defendant [and]

---

[48] *See In re USA Cafes,* 600 A.2d 43, 47 (Del. Ch. 1999).
[49] *Mobile Diagnostic Grp. Holdings, LLC v. Suer*, 972 A.2d 799, 802 (Del. Ch. 2009).

whether this court's exercise of personal jurisdiction over the defendants is consistent with the Due Process Clause."[50]

## B. CIVIL RULE 12(B)(6)

Upon a motion to dismiss under Civil Rule 12(b)(6), the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[51]  However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[52]

## C. CIVIL RULE 12(C)

A party may move for judgment on the pleadings pursuant to Civil Rule 12(c).[53]  In determining a motion under Civil Rule 12(c) for judgment on the pleadings, the Court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.[54]  The Court must take the well-pleaded facts alleged in the complaint as admitted.[55]  When considering a motion under Civil Rule 12(c), the Court also assumes the

---

[50] *Sample v. Morgan*, 925 A.2d 1046, 1056 (Del. Ch. 2007) (citing *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus. Inc.*, 871 A.2d 428, 438 (Del. 2005)).

[51] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

[52] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

[53] Civil Rule 12(c) provides:

> *Motion for judgment on the pleadings* — After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.  If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Del. Super. Civ. R. 12(c).

[54] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993); *see also Warner Commc'ns, Inc. v. Chris–Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Super.), *aff'd without opinion*, 567 A.2d 419 (Del. 1989).

[55] *See Desert Equities, Inc.*, 624 A.2d at 1205; *Warner Commc'ns, Inc.*, 583 A.2d at 965.

truthfulness of all well-pled allegations of fact in the complaint.[56] The Court must, therefore, accord plaintiffs opposing a Rule 12(c) motion the same benefits as a plaintiff defending a motion under Civil Rule 12(b)(6).[57] The Court may grant a motion for judgment on the pleadings only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[58]

## V. DISCUSSION

### A. THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR. VRANKIN UNDER 10 *DEL. C.* § 3114 OR 10 *DEL. C.* § 3104

Under 10 *Del. C.* § 3114 ("Section 3114"), a nonresident officer of a Delaware corporation, by accepting and holding office, consents to the exercise of personal jurisdiction over him in Delaware courts in two types of cases:

> (i) "all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such officer is a necessary and proper party"; or (ii) "any action or proceeding against such officer for violation of a duty in such capacity" *i.e.* a claim for breach of a fiduciary or other statutory duty.[59]

To qualify as a "necessary and proper party" under prong one, the party asserting personal jurisdiction must establish that: (i) the individual defendant has a legal interest in the dispute separate from the Delaware corporation's interest; and (ii) the plaintiff's claims arose out of the same facts and occurrences as the claims against the Delaware corporation and it serves judicial economy to consider the claims together.[60]

Even if a nonresident officer qualifies as a "necessary and proper party," however, the party asserting personal jurisdiction must still prove that personal jurisdiction is consistent with

---

[56] *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000).

[57] *See id.*

[58] *See Desert Equities, Inc.*, 624 A.2d at 1205; *Warner Commc'ns, Inc.*, 583 A.2d at 965.

[59] *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 277 (Del. 2016) (quoting 10 *Del. C.* § 3114(b)).

[60] *Id.* at 278.

due process.[61]  This is done by establishing that the nonresident officer had minimum contacts with the forum state.[62]

Turf Nation argues under prong one only—that Mr. Vrankin is a "necessary and proper party."  Specifically, Turf Nation argues that Mr. Vrankin has a separate legal interest in this civil action stemming from his individual liability as CFO for the Trust Fund Statute violations.  Mr. Vrankin argues that his legal interest is not separate from UBU's for purposes of establishing that he is a "necessary and proper party."  The Delaware Supreme Court's ruling in *Hazout v. Tsang Mung Ting*[63] helps resolve this dispute.

In *Hazout*, plaintiff, Tsang Mun Ting ("Ting"), sued defendant, Marc Hazout ("Hazout"), a nonresident CEO and CFO of a Delaware corporation based in Canada, Silver Dragon Resources, Inc. ("Silver Dragon"), for fraud and fraudulent transfer in violation of Delaware Uniform Fraudulent Transfer Act.[64]  As CEO and CFO of Silver Dragon, Hazout negotiated a capital infusion into Silver Dragon by Ting and other investors.[65]  The capital infusion mandated a change of control of Silver Dragon from Hazout to Ting and his fellow investors, who would then achieve the right to control Silver Dragon's board.[66]  The capital infusion would be consummated through a series of agreements (the "Agreements"), four of which specified that Delaware law was to govern their terms.[67]

After the parties negotiated the terms of the Agreements, but before the parties signed the Agreements, Ting provided the first $1 million of the $3.4 million capital infusion.[68]  Ting

---

[61] *Id.* at 278–79.
[62] *See In re USACafes*, 600 A.2d 43, 47 (Del. Ch. 1991) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).  *See also Martinez v. E.I. DuPont de Nemours & Co., Inc.*, 86 A.3d 1102 (Del. 2014).
[63] 134 A.3d 274 (Del. 2016).
[64] *Hazout*, 134 A.3d at 277.
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*

received assurances from Hazout and the other directors of Silver Dragon that they would soon execute the Agreements.[69]  Hazout and two other directors of Silver Dragon signed the Agreements, but a fourth refused.[70]  Rather than return the $1 million to Ting, however, Hazout, via Silver Dragon, sent $750,000 of the $1 million to a corporation that Hazout controlled.[71]

Based on this, Ting initiated fraud proceedings in this Court.[72]  Hazout moved to dismiss for lack of personal jurisdiction over him in Delaware.[73]  Hazout argued that Section 3114 applied to claims of a fiduciary nature only, and that because Ting was not suing for breach of fiduciary duty or alike, this Court lacked personal jurisdiction over Hazout.[74]  This Court disagreed and found that it had personal jurisdiction over Hazout.[75]  Hazout appealed.[76]

The Delaware Supreme Court affirmed this Court's ruling.[77]  It clarified that the plain language of Section 3114 provides two ways to obtain personal jurisdiction—either by establishing the nonresident officer is a "necessary and proper party," or by establishing that the nonresident officer breached his fiduciary duty or alike.[78]  The Court found personal jurisdiction under the "necessary and proper prong" of Section 3114 because: (i) the civil action involved a Delaware corporation of which Hazout was a director, (ii) Hazout was a "proper party" to the action because he had a legal interest in the dispute that was separate from Silver Dragon's interest; and (iii) the claims arose out of the same facts and occurrences as the claims against Silver Dragon and it served judicial economy to consider those claims together.[79]

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.* at 278.
[78] *Id.*
[79] *Id.*

Most relevant to the present dispute is the analysis of the "necessary and proper party" standard. The Supreme Court held that Hazout was a "proper party" because Ting asserted personal liability against Hazout for actions taken by Hazout in his official capacity as CEO and CFO of Silver Dragon.[80] This personal liability was separate and distinct from the liability of Silver Dragon.[81] The Supreme Court further held that judicial economy would be served by allowing Ting to seek redress against Silver Dragon and Hazout for injuries in one, rather than multiple forums, because the claims arose out of the same facts and occurrences.[82] As a final point, the Supreme Court noted that asserting jurisdiction over a "necessary and proper party" would not, as argued by Hazout, subject all nonresident officers to personal jurisdiction in Delaware.[83] Instead, the "necessary and proper party" standard requires a close nexus between the corporation and the conduct of the nonresident fiduciary such that an unrelated nonresident fiduciary could not be hailed into Delaware courts.[84]

In addition to declaring Hazout a "necessary and proper party," the Supreme Court also ruled that personal jurisdiction was constitutionally permissible.[85] The Supreme Court relied on the fact that the transaction involved a change of control of a Delaware corporation and that the Agreements provided for Delaware law to govern any disputes.[86] The Supreme Court also relied on the fact that all of Hazout's actions relevant to the lawsuit could not have been accomplished without the power of his offices in a Delaware corporation.[87] In this respect, by becoming a director and an officer of a Delaware corporation, Hazout purposefully availed himself of certain

---

[80] *Id.*
[81] *Id.*
[82] *Id.* at 290.
[83] *Id.*
[84] *Id.*
[85] *Id.* at 279.
[86] *Id.*
[87] *Id.*

16

duties and protections under Delaware law, as well as the chance that he could be sued in a Delaware court.

*Hazout* provides a basis for this Court to assert personal jurisdiction over Mr. Vrankin as a "necessary and proper party" to this litigation. First, this is a civil action against a Delaware corporation, UBU, and Mr. Vrankin was the CFO and President of UBU from 2014-2016. Second, Hazout is a "proper party" to this action because he has a legal interest in this dispute that is separate from Silver Dragon's interest. Mr. Vrankin is personally liable for the Trust Fund Statute violations purportedly committed in his capacity as CFO of UBU. This liability is separate and apart from UBU's liability.

Mr. Vrankin argues that he does not have a separate legal interest in the dispute because he owns only a small amount of equity in UBU. In contrast, according to Mr. Vrankin, Marc Hazout had a separate legal interest from Silver Dragon's legal interest in the civil proceeding because Mr. Hazout had "potentially diminished control over Silver Dragon, as well as a controlling interest in the allegedly improper transfer."[88] The *Hazout* court, however, never asserted this reasoning in finding that Mr. Hazout had a separate legal interest. Instead, the Delaware Supreme Court relied on the fact that Mr. Hazout could be personally liable as CFO for his purportedly fraudulent actions.[89] Because Turf Nation similarly sues Mr. Vrankin in his individual capacity as CFO, the same basis exists for finding he has a separate legal interest in this case.

---

[88] Def.'s Rep. Br. p. 12.
[89] *See Hazout*, 134 A.3d at 290. In fact, in rendering its decision, the Delaware Supreme Court cited to American Jurisprudence, which defines "proper party" as follows: "One whose interest may be affected by a judgment but whose presence is not essential for the adjudication of an action. Only those persons who are legally affected are proper parties to a lawsuit. A party is 'legally affected' by a cause of action, so as to be a proper party to the action, if the party has a legal interest in rights that are the subject matter of the cause of action." *See* 59 AM. JUR. *Parties* § 8 (2012).

Third, the claims against Mr. Vrankin arise out of the same facts and circumstances as the claims against UBU. All of the claims arise out of purported misconduct performed in Mr. Vrankin's official capacity as UBU's CFO and President, specifically, failure to maintain certain funds in a trust to compensate its subcontractors and suppliers. Finally, because the claims arise out of the same circumstances, it serves judicial economy for this Court to hear the claims together. Should the Court dismiss the claims against Mr. Vrankin for lack of personal jurisdiction, Turf Nation would simply re-file the Trust Fund Statute violation claims in separate courts across the United States where the violations occurred. It is a better exercise of judicial resources to hear Turf Nation's claims against Mr. Vrankin in this Court since this Court will already adjudicate similar claims against UBU.

While Mr. Vrankin may qualify as a "necessary and proper party," the Court finds that there is not a proper basis to subject Mr. Vrankin to the jurisdiction of this Court. In *Hazout*, the Supreme Court noted that qualification as a "necessary and proper party" is not sufficient to confer jurisdiction. The Supreme Court went on to re-emphasize that the Court must examine whether the exercise of personal jurisdiction is consistent with the person's constitutional expectations of due process.[90] The Supreme Court then provides a useful example of a situation where application of Section 3114 would be inconsistent with Constitutional expectations of due process:

> For example, if plaintiffs attempted to drag corporate officers and directors into Delaware by naming them as defendants in a products liability case where the products had been designed and distributed from a state other than Delaware to diverse consumers, most of whom were in states other than Delaware, the minimum contacts test would provide substantial protection. It would be constitutionally questionable, to say the least, for Delaware to exercise personal jurisdiction when Delaware's status as the state of incorporation had no rational connection to the

---

[90] *See Hazout*, 134 A.3d at 291 ("…the way to police that concern is to apply the method we do when implementing our state's long-arm statute, which is to give effect to its terms, and to use the minimum contacts analysis required by *International Shoe* to ensure that the statute is not used in a situationally inappropriate manner.").

18

cause of action, where the conduct is governed by the laws of others states, and where there is no reason why a corporate fiduciary should expect to be named as a party at all, much less in a suit where the underlying conduct and claims have no rational connection to Delaware and provide no rational basis for Delaware to apply its own law. Not only that, the traditional protections of the corporate shield are unaffected by this decision, and there are serious limits on the ability of plaintiffs to use veil-piercing to hold corporate fiduciaries or stockholders financially responsible for actions of the corporation itself.[91]

Here, Turf Nation brings claims against Mr. Vrankin under the laws of the States of Pennsylvania, Texas, New York, Colorado and Wisconsin. The purported actions of Mr. Vrankin giving rise to these claims occurred in Downer's Grove, Illinois, Pennsylvania, Texas, New York, Colorado and/or Wisconsin. Turf Nation is a Delaware corporation but its principal place of business is in Dalton, Georgia. UBU is a Delaware corporation with its principal place of business in Downer's Grove, Illinois. The Agreement calls for the application of Georgia law.[92]

Under these circumstances, the Court sees no rational connection to Delaware other than the place of incorporation of UBU and Turf Nation. Delaware's status as the state of incorporation has no rational connection to the causes of action. The Court will not be applying Delaware law. The purported conduct giving rise to the harm occurred in states other than Delaware. Turf Nation makes no claims that Mr. Vrankin misused his position at UBU or that he breached fiduciary duties owed to UBU let alone Turf Nation. The Court sees no reason why a corporate fiduciary, like Mr. Vrankin, would have expected to be hauled into a Delaware court to answer claims regarding the violation of trust fund statutes in Pennsylvania, Texas, New York, Colorado or Wisconsin. The wrongs alleged here are either tort claims or breach of contract claims unconnected with the internal affairs or corporate governance of a Delaware corporation.

---

[91] *Id*. at 291, n.60.
[92] *See* Agreement ¶ 27.

Turf Nation makes an efficiency argument for the exercise of personal jurisdiction over Mr. Vrankin, contending that if the Court does not let Turf Nation proceed against Mr. Vrankin in Delaware then Turf Nation will need to file another action in Illinois or alike. The Court does not find this argument persuasive. An equitable argument regarding the efficiencies of litigation weakens when Turf and not Mr. Vrankin or UBU initiates the civil action in Delaware.

The Court also does not have jurisdiction over Mr. Vrankin under 10 *Del. C.* § 3104 ("Section 3104"). Other than being an officer of UBU, Mr. Vrankin has no other contacts with Delaware. Turf Nation fails to plead sufficient grounds for the exercise of specific or general jurisdiction. Mr. Vrankin has not engaged in the type of persistent course of conduct that would support the exercise of general jurisdiction.[93] Moreover, Turf Nation's complained of injury in Delaware—harm occurring in Delaware because UBU and Turf Nation are Delaware corporations—did not occur in Delaware such as would support the exercise of specific jurisdiction.[94]

For the reasons set forth above, the Court finds that Turf Nation has failed to demonstrate that the Court can exercise personal jurisdiction over Mr. Vrankin under either Section 3114 or Section 3104. Accordingly, the Vrankin Motion to Dismiss is **GRANTED**.

B.    **THE AMENDED COUNTERCLAIM PLEADS FRAUD WITH SUFFICIENT PARTICULARITY**

Delaware Superior Court Civil Rule 9(b) requires all allegations of fraud to be pleaded with particularity.[95] In order to meet the particularity requirement, a complaint "must state the

---

[93] *See, e.g., Hirshman v. Vendamerica, Inc.*, C.A. No. 90C-AP-40-1CV, 1992 WL 52141, at *2 (Del. Super. Mar. 9, 1992) (holding that the status as an officer or director of a Delaware corporation without more is not enough to confer jurisdiction).

[94] *See, e.g., Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233, 1238 (Del. Super. 2012) (holding that pecuniary loss most likely occurs at the corporation's headquarters or principal place of business); *see also Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 528 (7th Cir. 1981) (purely economic harm is normally sustained at a corporation's principal place of business).

[95] Del. Super. Civ. R. 9(b).

time, place, and contents of the alleged fraud, as well as the individual accused of committing the fraud."[96]  On the content requirement, the following elements must be pleaded to state a claim for fraud:

> (1) a false representation, usually of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[97]

The Amended Counterclaim sufficiently alleges the time, place, and source of the fraud. UBU alleges that Turf Nation, specifically the Nicholls, engaged in a scheme to defraud UBU and UBU investors for the financial benefit of Turf Nation.[98]  The Amended Counterclaim states that the Nicholls initiated this scheme on October 4, 2014 and continued it until November 22, 2016 when UBU discovered the fraud.[99]  The Amended Counterclaim references several e-mails between the Nicholls which discussed the Nicholls' intent to create and backdate a contract between Turf Nation and UBU.[100]

The Amended Counterclaim also sufficiently alleges the content of the fraud.  Turf Nation claims that UBU's allegations do not allege a false representation or alike by Turf Nation because the alleged fraud was perpetrated by UBU's own Mark Nicholls.  Moreover, Turf Nation argues that any harm caused by the purported fraud was to UBU's investors, not UBU.  Turf Nation's argument ignores a large portion of the allegations in the Amended Counterclaim.

The Amended Counterclaim details specific misrepresentations related to the fraud scheme between the Nicholls, including that: (i) the Nicholls fabricated the Agreement to

---

[96] *Universal Capital Mgmt., Inc. v. Micco World, Inc.,* C.A. No. N10C-07-039, 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012).
[97] *Desert Equities*, *Inc.*, 624 A.2d at 1208.
[98] Am. Countercl. ¶ 3.
[99] *Id.* ¶¶ 14–19.
[100] *Id.* ¶¶ 3, 14.

provide to potential UBU investors[101]; (ii) the Nicholls backdated the Agreement to cause investors to believe that UBU and Turf Nation had a longstanding business relationship[102]; (iii) the Nicholls terminated the Agreement, but represented to investors in the MIPA that the Agreement would last until 2023[103]; and (iv) the Nicholls secretly terminated the Agreement without providing notice to other directors at UBU.[104]

The Amended Counterclaim alleges that the Nicholls knew the representations were false, but that they made the representations anyway in an attempt to induce investment into Turf Industry, and in turn, Turf Nation.[105] Moreover, the knowing misrepresentations sought to induce UBU to: (i) continue to make purchase orders under the Agreement; and (ii) continue to make payments at a 30% premium under the Agreement without a designated application to particular invoices.[106] Finally, the Amended Counterclaim alleges that UBU relied on Turf Nation's representations concerning the Agreement, and suffered damage as a result.[107] The damage included premium payments, purchase orders submitted in reliance on the $5 million line of credit, and reputational damage as a result of Turf Nation contacting UBU's customers about UBU's purportedly defaulted payment.[108]

As an alternative argument, Turf Nation alleges that UBU lacks standing to bring a fraud claim because, as previously argued, any harm caused by the alleged fraud occurred to UBU's investors, not UBU. Again, Turf Nation ignores numerous allegations of harm caused to UBU through the Nicholls' purported fraud scheme.

---

[101] *Id.* ¶¶ 3, 14–16.
[102] *Id.* ¶¶ 4, 16–17.
[103] *Id.* ¶¶ 4, 17–18.
[104] *Id.* ¶¶ 19, 20.
[105] *Id.* ¶¶ 13, 17, 20–21.
[106] *Id.* ¶¶ 20, 22.
[107] *Id.*
[108] *Id.*

For the reasons set forth above, the Court finds that the Amended Counterclaim properly states a claim for fraud under Civil Rule 12(b)(6) and Civil Rule 9(b). Accordingly, the Turf Nation Dismissal Motion is **DENIED**.

## C. THE BREACH OF CONTRACT AND TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS CLAIMS ARE NOT RIPE FOR RELIEF UNDER RULE 12(C)

### i. *The Court does not have enough information about the fraud claim to grant relief on the breach of contract claim under Rule 12(c)*[109]

In the Amended Counterclaim, UBU alleges that Turf Nation breached the Agreement by: (i) improperly and secretly terminating the Agreement in violation of Sections 13 and 14; (ii) charging a 30% premium in violation of Section 5(b); (iii) failing to provide a $5 million line of credit as provided for in Section 5(e); and (iv) improperly contacting UBU's customers and clients to collect on amounts due in violation of Section 5(g).[110] As it relates to the 30% premium, UBU explained in its Affirmative Defenses that: "for every dollar of new turf product provided by Turf Nation to UBU, Turf Nation overbilled or added a 30% premium surcharge when it invoiced UBU. The additional 30% was apparently intended to be applied to amounts past due on still unpaid invoices, in other words as loan repayments."[111]

Turf Nation first argues that UBU cannot maintain a breach of contract claim related to breach of the Agreement because Turf Nation properly terminated the Agreement pursuant to Section 14(e). Section 14(e) of the Agreement provides that: "Notwithstanding any other provision in this Section 14 or any other Section contained in this Agreement, [Turf Nation] may terminate this Agreement upon thirty (30) days written notice to UBU, for any reason."[112] Turf

---

[109] Despite Section 27 of the Agreement, which provides that Georgia law governs disputes arising from the Agreement, the parties rely on Delaware law in making their arguments. *See* Agreement ¶ 27.
[110] Am. Countercl. ¶¶ 27–28
[111] Answer ¶ 19.
[112] Agreement § 14(e).

23

Nation argues that because it sent UBU's CEO Mark Nicholls a notice of termination, Turf Nation was entitled to terminate the Agreement under the express language of Section 14(e).

UBU acknowledges that Mark Nicholls received the termination letter. However, UBU challenges Turf Nation's argument on three bases. First, UBU argues that Turf Nation's interpretation of Section 14(e) renders other provisions of the Agreement meaningless, specifically Section 3 and Section 14. Section 3 provides for the term of the Agreement and its renewal process. Section 14 conditions Turf Nation's termination remedies on the existence of an UBU default—which default UBU alleges never occurred. UBU, in essence, argues that one provision of the Agreement cannot render the rest of the Agreement's provisions meaningless.

Second, UBU argues that Section 14(e) is void as unconscionable. UBU alleges that the Nicholls added Section 14(e) at the last minute knowing they would later terminate the Agreement without cause in furtherance of their fraud scheme. As an exhibit to the Amended Counterclaim, UBU provides a copy of an undated draft agreement referenced by the Nicholls in an e-mail conversation.[113] This draft agreement is identical to the Agreement signed by the Nicholls, save Section 14(e) which the Nicholls added to the Agreement before executing it.[114] Based on this and the other allegations of fraud, UBU argues that Section 14(e) of the Agreement is unenforceable and cannot form the basis for Turf Nation's decision to terminate the Agreement.[115]

Third, even if the Court rejects the first two arguments, UBU argues that the termination notice itself was deficient due to Mark Nicholls' fraud against UBU. UBU argues that notice to Mark Nicholls, who was defrauding UBU together with Turf Nation, cannot serve as notice to

---

[113] Am. Countercl. Ex. 6.
[114] *Compare* Am. Countercl. Ex. 1 *with* Ex. 6.
[115] *See e.g., Worldwide Ins. Grp. v. Klopp*, 603 A.2d 788, 792 (Del. 1992) (holding that "[t]he Chancery Court was correct in striking [the] unconscionable clause while enforcing the remainder of the contract.").

24

UBU for purposes of satisfying the notice requirements.[116] UBU explains that notice was sent only to Mark Nicholls at his Canadian home, and not to UBU's business address. UBU contends that no one at UBU other than Mark Nicholls knew about the termination, and that Turf Nation kept the termination a secret from UBU for more than two years. Based on this, UBU argues that the notice sent by Turf Nation was deficient for purposes of terminating the Agreement.

In the alternative, Turf Nation argues that even if it did not properly terminate the Agreement, Turf Nation's actions did not breach Sections 5(b), 5(e), or 5(g) of the Agreement as argued by UBU in support of its claim. First, Turf Nation contends it did not violate Section 5(b) of the Agreement by charging UBU a 30% premium. Section 5(b) provides that Turf Nation,

> warrants that the prices charged to UBU during the term of this Agreement . . . for the manufacture and sale of the Products in accordance with a Purchase Order does not and shall not exceed the selling price [Turf Nation] charges to its most valued customer.[117]

Turf Nation contends the "30% premium" was not a "price charged to UBU" under the meaning of Section 5(g) because it was charged in satisfaction of UBU's outstanding debts.

Second, Turf Nation contends it did not violate Section 5(e) because it provided the $5 million line of credit to UBU. However, Turf Nation contends this line of credit was subject to other provisions of the Agreement, such as Section 5(d) which specified UBU's payment terms as "net sixty (60) days."[118] Therefore, while UBU could have up to $5 million outstanding at any one time, Turf Nation contends it still had to pay Turf Nation on invoices within sixty days, which UBU failed to do.

---

[116] *See In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 n.22 (Del. Ch. 2003) ("When corporate fiduciaries . . . have a self-interest in concealing information—such as the falsity of the financial statements that they had helped prepare—their knowledge cannot be imputed to the corporation.").

[117] Agreement § 5(b).

[118] *See id.* § 5(d).

Third, Turf Nation contends it did not violate Section 5(g) because Section 5(g) permitted Turf Nation to file liens and alike in order to ensure payment of invoices. Because UBU was in default on its payments, Turf Nation contends its actions in contacting UBU's customers were permissible under the Agreement.

Based on the foregoing, it is premature to dismiss the breach of contract claim against Turf Nation under Civil Rule 12(c). The Court must look to the pleadings, view the facts as pleaded and draw any inferences in a light most favorable to the non-moving parties.[119] If no material issues of fact exist and a party is entitled to judgment as a matter of law, the Court could grant the Turf Nation Judgment on the Pleadings Motion.[120] At this stage in the litigation, the Court finds that too many material issues of fact exist to grant judgment on pleadings as a matter of law.

UBU's breach of contract claim is intertwined with UBU's fraud claim, as both allege that Turf Nation committed fraud in executing, terminating, and accepting payments pursuant to the Agreement. However, the Court does not have enough information at this stage in the litigation to judge the merits of UBU's fraud claim. Therefore, the parties need to develop the fraud allegations through discovery before the Court can make a determination as to the strength of the fraud claim and its effect on UBU's other claims in this case. Specifically, the Court needs more information about: (i) the extent of the purported fraud between the Nicholls; (ii) the facts surrounding UBU's discovery that Turf Nation terminated the Agreement (*e.g.*, who at UBU knew, and when); and (iii) the facts surrounding the payments made by UBU to Turf

---

[119] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993); *see also Warner Commc'ns, Inc. v. Chris–Craft Indus., Inc.*, 583 A.2d 962, 965 (Del. Super.), *aff'd without opinion*, 567 A.2d 419 (Del. 1989).
[120] *See Desert Equities, Inc.*, 624 A.2d at 1205; *Warner Commc'ns, Inc.*, 583 A.2d at 965.

Nation and Turf Nation's conduct in calculating, accepting and applying payments to invoices or credit.

### ii. The Court does not have enough information about the fraud and breach of contract claims to grant relief on the tortious interference with contractual relations claim under Rule 12(c)

To make out a claim for tortious interference with contractual relations under Delaware law, the plaintiff must prove: (i) the existence of a valid contract; (ii) knowledge of such contract on the part of the defendant; (iii) an intentional act on the part of the defendant that is a significant factor in causing the breach of contract; (iv) lack of justification for such act; and (v) damages.[121]

UBU argues that Turf Nation tortuously interfered with contracts UBU had with its customers. Specifically, UBU cites to the fact that Turf Nation sent notice letters to UBU's clients falsely stating that UBU was delinquent on its obligations and demanding the issuance of joint checks for the outstanding debts purportedly owed.[122] UBU contends Turf Nation did this, despite knowing that UBU was operating under the terms of the Agreement and was making payments on the revolving $5 million line of credit.[123] Based on the information provided by Turf Nation, UBU's clients and contractors terminated their contracts with UBU, resulting in UBU's loss of cash flow and inability to pay its debts.[124]

Turf Nation argues that it was justified in contacting UBU's clients. Turf Nation contends it provided notice of UBU's default to UBU on November 15, 2016, and that only after UBU failed to cure its default did Turf Nation contact UBU's customers, inform them of UBU's

---

[121] *Beard Research Inc. v. Kates*, 8 A.3d 573, 605 (Del. Ch. 2010).
[122] Am. Countercl. ¶ 36.
[123] *Id.* ¶ 37.
[124] *Id.* ¶¶ 41–42.

default, and exercise its rights under the applicable mechanic's lien and payment bond statutory schemes.

Again, it is premature to dismiss the tortious interference with contractual relations claim against Turf Nation under Civil Rule 12(c). Here, the parties do not agree on the facts and ask the Court to apply those facts to the law. Discovery and the adversary process will properly frame this issue as one for summary judgment or trial. At this point in the civil action, this claim is intertwined with UBU's breach of contract claim such that the Court cannot make the legal determination as to whether Turf Nation was justified in contacting UBU's clients. Later, the Court may be able to determine whether UBU defaulted on its payments in the first instance and that Turf Nation was justified in its subsequent conduct. This latter determination, however, is necessarily dependent on the outcome of UBU's fraud and breach of contract claims.

For the reasons set forth in Section V.C.i and V.C.ii, the Turf Nation Judgment on the Pleadings Motion is **DENIED**.

### VI. CONCLUSION

For the reasons discussed herein, Defendant Joseph Michael Vrankin's Motion to Dismiss for Lack of Personal Jurisdiction is **GRANTED**; Counter-Defendant Turf Nation Inc.'s Motion to Dismiss Count I of Counter-Plaintiff UBU Sports, Inc., n/k/a Artificial Turf Sports Field, Inc.'s Counterclaims is **DENIED**; and Counter-Defendant Turf Nation Inc.'s Motion for Judgment on the Pleadings on Counts II and III of Counter-Plaintiff UBU Sports Inc., n/k/a Artificial Turf Sports Field, Inc.'s Counterclaims is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 11, 2017
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge

28